## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SOREN TRANSPORT, INC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | CIVIL ACTION NO. |
| MATTHEW H. McALLISTER, SCOTT | § | |
| DELMAR MINER, BRANDON G. BELL, | § | |
| AND KEYSTONE LOGISTICS, INC. | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Soren Transport, Inc. ("Soren") files this Original Complaint against Defendants Matthew H. McAllister ("McAllister"), Scott Delmar Miner ("Miner"), Brandon G. Bell ("Bell"), and Keystone Logistics, Inc. ("Keystone") (collectively, "Defendants").

## I.      BACKGROUND

1.      Soren hired and trained McAllister and Miner (collectively, the "former employees") to work in the freight brokerage industry. Soren provided them confidential information and trade secrets as part of their employment, and they promised in return to revere such as confidential Soren property that they would not abuse or steal in order to enrich their own pockets to the detriment of Soren. They also promised not to use Soren confidential information in subsequent employment in order to compete against Soren.

1

Both former employees broke their promises and these, with the other Defendants, are unlawfully seeking to enrich themselves through these breaches.

2.      Specifically, in a scheme designed to steal Soren trade secret and confidential information, McAllister and Miner quit Soren, became agents of Keystone, and in a conspiracy between all Defendants, delivered to Bell and other Keystone agents the trade secrets of Soren in their collective attempt to steal Soren's business. The Defendants collectively and unlawfully seized Soren customer/carrier lists, pricing and marketing information, business jobs, and other information that none of the defendants had any right to misappropriate or to use to compete against Soren. Some of the stolen trade secrets they took directly from Soren computers. For these, the former employees brazenly logged into Soren's password protected accounts and copied, manipulated, sent, and/or shared Soren confidential information to agents of Keystone. Collectively, all the Defendants seek to profit from Soren's investment and hard work without paying the price for developing the trade secrets themselves.

3.      In short, the former employees betrayed the trust and duties that they owed to Soren, and Bell and Keystone without conscience have shown themselves eager to use Soren's former employees to steal Soren's trade secret and confidential information.

4.      The law condemns the Defendants' conduct. Soren is seeking an injunction to stop the brazen theft and to require the Defendants to return all the stolen property. Soren also seeks damages for any losses suffered to date. Soren brings herein the following claims:

- Claims under the federal Defend Trade Secrets Act of 2016

2

- Claims under the federal Computer Fraud and Abuse Act

- Claims under the Texas Uniform Trade Secrets Act

- Texas breach of contract claims

- Texas conversion claims

- Tortious interference with contract/prospective economic relations claims

- Conspiracy

- Claims for attorneys' fees and expenses

- Claims authorized by federal and state law for an injunction

5.      As to this last item (injunction), Soren will be moving shortly for a preliminary injunction and hope that all Defendants will simply agree to such. Whether or not they will, however, will only go towards the amount of attorneys' fees that they will ultimately have to repay Soren, and not towards the relief that Soren will seek. That is, Soren will be immediately moving for and seeking a preliminary injunction that forbids any Defendant from using Soren trade secrets and confidential information or to compete against Soren using Soren's own confidential information. Soren will be seeking expedited discovery to determine the extent of the wrongdoings.

## II.      THE PARTIES

6.      Plaintiff Soren is a Texas corporation established in 2011 and is located at 17302 House Hahl Rd, Suite 300, Cypress, Texas 77433. Soren is a third-party logistics service provider that operates as an authorized agent for England Logistics, Inc.

("England") in arranging for transportation of a variety of freight by different modes of transportation across North America.

7.     Defendant McAllister is an individual who resides in Fort Bend County, Texas at 4510 Buffalo Lake Ct., Richmond, Texas 77406, and may be served there.

8.     Defendant Miner is an individual who resides in Harris County, Texas at 10880 Barker Cypress Road #8205, Cypress, Texas 77433 and may be served there.

9.     Defendant Bell is an individual who resides in Montgomery County, Texas at   2714 Crosshaven Way, Conroe Texas 77304-2364.

10.     Defendant Keystone is an Indiana corporation with its principal place of business located at 336 West U.S. Hwy 30, Suite 201, Valparaiso, IN 46385. Defendant Keystone can be served process upon its registered agent: David Antonson, 336 W U.S. Highway 30, Valparaiso, IN 46385, or upon any officer or director at its corporate offices.

### III.    JURISTICTION AND VENUE

11.     This Court has personal jurisdiction over Defendants because they are either residents of the State of Texas and/or performed acts that constitute doing business in this State under Tex. Civ. Prac. & Rem. Code § 17.042.

12.     This Court has original jurisdiction under 28 U.S.C. § 1331 over Soren's causes of action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and over Soren's computer fraud cause of action under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g).

13.     This Court also has supplemental jurisdiction over Soren's cause of action arising under state law pursuant to 28 U.S.C. § 1367, because those claims are so closely

related to Soren's claims under the Defend Trade Secrets Act and the Computer Fraud and Abuse Act that they form part of the same case or controversy under Article III of the United States Constitution.

14.     This Court has both general and specific personal jurisdiction over Defendants. As to Defendant Keystone, it has purposefully availed itself of the benefits and protections of the State of Texas' laws by establishing sufficient minimum contacts with the State of Texas such that it could reasonably anticipate being haled into court here (particularly through acting in concert with their Texas agents, including Defendants Bell, McAllister, and Miner, who themselves reside in Texas and conduct substantial business originating in Texas on behalf of Keystone).

15.     Venue is appropriate pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and because Defendants McAllister and Miner each have contracts with Soren that requires that the venue "be the courts located in Harris County, Texas." Exhs. 1 and 2 at p.3 (Confidentiality and Non-Competition Agreements for McAllister and Miner respectively).

## IV.   FACTS

**After extensive business and market development, Soren acquired trade secrets and confidential information of high value and which are not generally known**

16.     Soren operates as an authorized agent for England, an interstate property/freight broker (as defined in 49 U.S.C. § 13102(2)) holding a license granted to it

to do so by the Federal Motor Carrier Safety Administration and the United States Department of Transportation.

17.    Operating under England's authority as an interstate broker, Soren arranges for transportation of freight owned by Soren's customers by licensed motor carriers. Soren has developed and compiled a vast list of customers, prospective customers, carriers and prospective carriers, through methods and techniques, including, but not limited to, implementation of market studies, customer and carrier vetting and contact with customers and carriers in order to determine the distinct needs of customers, identity of product and traffic lane information regarding such customers, and identifying, negotiating for, recording and establishing rates or estimated rates for such customers.

18.    One of the tools that Soren uses to acquire and safeguard its trade secret and confidential information is computer software, including subscription-based transportation management software programs. For some of these Soren pays hefty fees in order to gain access to some of these programs (e.g., McLeod); all of these software programs (Excel, Google Docs, BluJay Solutions, etc.) are password protected and collectively house Soren's and England's confidential data, including customer lists, shipping rates, shippers and capacities, routes, etc.

19.    The work to acquire such trade secrets has come at a significant investment by Soren and England and has given Soren and England a competitive advantage over competitors who have not undertaken the same investment. Such information enables Soren to attract customers and keep customers each time a customer has a need to transport

customer freight. The information that Soren has developed is highly confidential and trade secret information.

**The former employee Defendants were in a relationship of confidence, had access to Soren's highly confidential information, and entered into obligations to protect Soren and its confidential information**

20.     Soren hired McAllister on June 12, 2017, and hired Miner on August 15, 2018. They were full time employees.

21.     None of these former employees had any experience in the freight brokerage industry. Accordingly, Soren invested in these former employees and trained them, provided them equipment, office space, position and responsibilities, and fair compensation and benefits. Soren also gave them and continued to provide them Soren trade secret and confidential information that these former employees would need in order to succeed at their vocations, build the goodwill of Soren, and produce profit for Soren and for themselves.

22.     Both worked their way into Soren's trust and received promotions and/or increased responsibility during their tenure at Soren. McAllister started as a Capacity Analyst I; later was promoted to a Capacity Analyst II, and began to assume the responsibilities of an Account Manager at the time he quit his employ at Soren.

23.     Soren hired Miner as operations support, then promoted him to a Sales Department Representative, and then finally promoted him to an Account Manager over sales, which position he held until he quit his employ.

24.     The former employees' responsibilities within their various titles would have included the following duties:

- Identifying customers and potential customers with shipping needs;

- Identifying carriers who had the capacity and routes to meet those needs;

- Matching available carriers and capacity to customers, negotiating pricing, and attending to other details to ensure the customers' freight was transported timely;

- Using computer programs and transportation management software to log or gain access to all of the above information; and

- Communicating with customers and shippers (and potential customers and shippers) to accomplish all of the above.

25.    The former employees gained the trust of Soren sufficient that they performed some or all of these functions at home or on weekends, either on computers that Soren permitted them to use at home or on weekends or on home computers upon which Soren permitted them to load Soren information.

26.    As each former employee enjoyed an employment relationship with Soren, they had duties under Texas law not to use Soren's confidential and proprietary information acquired during the relationship in a manner adverse to the interests of Soren. But not only did the former employees have these common law duties, Soren expressly imposed duties of loyalty upon them through an Employee Handbook and through confidentiality agreements.

27.    Specifically, before commencing their duties, the former employees received and agreed to abide by Soren's policies set forth in the Employee Handbook. At some point, both signed the Employee Handbook, either by hand and/or by electronic signature means. E.g., Exh. 3 (containing copy of Employee Handbook and copies of electronic signatures for the former employees).

28.    The Employee Handbook informed Soren's former employees that all the electronic information residing on Soren's servers and computers, including all emails, was "the property of Soren." Exh. 3 at 17. It informed the former employees that they were expected to, and agreed to, behave "in a manner that [was] beneficial to Soren." *Id.* at 18. They agreed to maintain the confidences of "customers and clients," as an essential duty to "promot[e] goodwill." *Id.* Further, they agreed to report to Soren any illegal, unethical, or dishonest actions by another employee. *Id*.

29.    The Employee Handbook also informed the former employees of Soren's policies on Confidential Information, which they acknowledged and agreed to abide by. Specifically, the former employees agreed to comply with the following Soren policies on confidential information found in the Employee Handbook:

> If during the course [of] their employment, or after their termination, employees acquire confidential or proprietary information about Soren and its customers, ***such information is to be handled in strict confidence*** and ***not to be discussed with outsiders.*** Employees are also responsible for the internal security of such information.
>
> All confidential information is the ***exclusive property of Soren***. Employees are ***prohibited from divulging*** confidential and proprietary information outside the regular course of business. Confidential and proprietary information includes, but is not limited to: information concerning company's customers, prospective customers, personnel, contracts, bids, sales, plans, computer codes, reports, and/or trade secrets.
>
> It is expected that all employees of Soren maintain strict confidentiality by not disclosing any confidential information to anyone outside the workplace, or to other employees or coworkers who do not have a "need to know". Computer files containing confidential information should be securely protected.
>
> Note: All employees are required to return all company property, (confidential and otherwise) immediately upon termination….

***Employees will be required to sign a Confidentiality Agreement agreeing that all confidential information known to, or in the possession of, that employee will remain strictly confidential.*** Any violation of this policy is subject to discipline up to and including termination.

*Id.* at 23 (emphasis added).

30.     In accordance with the policies set forth above, all three former employees signed Confidentiality and Non-Competition Agreements. Exhs. 1-2 (signed agreements by McAllister and Miner respectively). These agreements had covenants relating to confidential information and relating to non-competition.

31.     Under the covenants relating to confidentiality, the former employees "acknowledge[d] and agree[d] that information obtained and used" in Soren's business that was not public was "confidential information in the nature of a trade secret, and that such confidential information is owned by" Soren. *Id.* at 2. Further the former employees agreed that:

- "All business produced or serviced by [them] during his…employment is and shall be deemed to be exclusively the property of" Soren;

- Each would "not, directly or indirectly, during or after termination…divulge to persons other than authorized officers of [Soren], or use for his…own benefit, any confidential information, documents or other records of the business of [Soren] (whether or not developed by [them])";

- Each would "not, after termination of his…employment, retain or furnish to any person, other than an authorized representative of [Soren], any copies of such confidential information";

- "Confidential information acquired during the employment with [Soren] [would] not be used by him…to the detriment of [Soren], directly or indirectly, after or subsequent to termination of employment, for any reason whatsoever"; and

- Each would "deliver to [Soren] at the termination of his employment all documents made, composed or received by [them], solely or jointly with others, and which are in [their] possession, custody, or control at such date and which are related in any manner to the past, present, or anticipated business of [Soren]."

*Id*.

32.     Under the covenants relating to non-competition, Soren agreed to "provide to [the former employees] on-going specialized training regarding [Soren's] business methods…[and] with certain confidential and proprietary information and materials belonging to [Soren], including but not limited to, information provided to [Soren] by its clients and prospects." *Id.* at 3. In return, each former employee agreed that for two years after separation from Soren, each would not "directly or indirectly:

- "Solicit clients of [Soren] for the purpose of selling or providing products or services" offered by Soren;

- "Induce clients or prospective clients of [Soren] to terminate, cancel, not renew, or not place business with [Soren]. *Id.*

33.     The former employees agreed that this non-competition restriction applied for those customers or prospective customers that either the former employees had contact with or obtained information about through confidential information during the previous two years of his employment with Soren. Moreover, each former employee agreed that the non-competition restrictions prohibited them from lending assistance to any other entity to do anything that the noncompetition restrictions prohibited. *Id.*

11

**The former employees breached their agreements and abused their relationships with Soren and joined with the other defendants to steal and misappropriate Soren's trade secrets and business**

34.     Both former employees terminated their employ with Soren in recent months. Miner resigned on September 18, 2020 and immediately went to work as an agent for Defendant Keystone's brokerage business; and McAlister resigned on October 1, 2020 and likewise immediately went to work as an agent for Defendant Keystone's brokerage business. (Upon information and belief, Keystone is an authorized agent of license property/freight broker US 1 Logistics, much the same way as Soren is an authorized agent of England).

35.     Although expedited discovery will be needed to determine the extent of the wrong doings and damages caused by the conduct of the former employees, Soren recently acquired the following evidence to show that the former employees have been and now are in the process of breaching their duties and contracts with Soren, and using Bell and Keystone to assist.

36.     At the time Miner resigned from Soren and disclosed that he was going to go work for a competitor (Keystone), another Soren employee reminded Miner that Miner had invested a lot of work as a Soren agent to gain customers and contacts for Soren and reminded Miner that he would have to start his business all over from scratch. Miner responded that at his new job he would not be the one to directly call upon the clients he formerly acquired for Soren.

37.     Upon information and belief, Miner was planning a scheme with the other Defendants where Miner and McAllister would feed Soren confidential and proprietary

information to other Keystone agents, such as Defendant Bell, and thus they could *indirectly* steal Soren business.

40.     In October 2020 Soren learned that one of Soren's customers (identified in this Complaint simply as "LP") accepted Keystone as a new brokerage agent for LP's freight business to compete with Soren. Soren asked LP to confirm the rumor and asked which agent for Keystone acquired the business. Keystone confirmed and said Bell obtained the business. Emails acquired by Soren show that McAllister and Miner were providing information to Bell regarding LP, and through this means McAllister and Miner were able to take Soren business indirectly. Below are excerpts from emails and load sheets that show Keystone (through Miner, McAllister, and Bell) now doing shipping jobs for Soren's customer instead of Soren (to keep the information confidential, Soren has redacted the documents to hide the identity of the customer in this public filing).





41.     Soren has recently learned that LP has awarded additional business to Keystone, thus exacerbating the damage.

42.     Soren's further investigation shows Defendants have a pattern of similar behavior to steal Soren's business.

43.     For example, Soren's forensic investigation of Miner and McAllister emails when at Soren show that McAllister was sending emails to himself and/or to Miner shortly before McAllister resigned in October 2020. At that time, Miner had already left Soren and was then acting as an agent of Keystone. The type of information that McAllister sent to himself and/or Minor at Keystone included pages and pages of Soren customer lists and contact information, pricing details on routes, and other sensitive business information that had only one purpose: to help the Defendants take Soren customers and business away. A redacted sample of some of some of this pilfered information follows:



44.     Additional discovery has shown that Bell is now calling on additional Soren customers (besides LP) using Soren confidential information that McAllister and Miner knew about and acquired when working at Soren.

45.     Once again, Soren will need expedited discovery to uncover the extent of the theft and damage. The evidence to date, however, shows a concerted effort by all the Defendants to unlawfully use the information that McAllister and Miner took with them after leaving Soren and to use that information, directly or indirectly (through the other Defendants) to steal Soren's business.

## V.     CAUSES OF ACTION

### COUNT I: Violations of the Defend Trade Secrets Act of 2016
### (Against all Defendants)

46.     Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

47.     The actions of Defendants, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq.

48.     Soren is the owner of certain valuable trade secrets and confidential information, identified above, collectively as "Trade Secrets and Confidential Information."

49.     These Trade Secrets and Confidential Information are related to services used in, or intended for use in, interstate or foreign commerce.

50.     Soren's Trade Secrets and Confidential Information derive independent economic value, actual or potential, from not being generally known to, and not being

readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain secrecy.

51.     By using Soren's Trade Secrets and Confidential Information in the ways disclosed herein, Defendants have misappropriated, used, and/or disclosed Soren's Trade Secrets and Confidential Information. On information and belief based on the evidence Soren has been able to obtain to date, Defendants' use of Soren's Trade Secrets and Confidential Information have deprived Soren of business and will likely deprive Soren of business in the future.

52.     Soren took reasonable steps to protect its Trade Secrets and Confidential Information. In particular, Soren provides Employee Handbooks to all employees, including to the former employees, to provide them notice of Soren's Trade Secrets and Confidential Information and of their duties to protect such. Soren requires its employees, including the former employees, to sign Confidentiality and Noncompetition Agreements.

53.     In addition, Soren maintains much of its Trade Secrets and Confidential Information on computer and network systems that are restricted to general public access. Soren requires and issues usernames and passwords for its employees to gain access to this information, and requires anybody that has access privileges to contractually promise that they will not abuse these privileges.

54.     On information and belief, at the time Defendants disclosed and/or improperly received and/or improperly used Soren's Trade Secrets and Confidential Information, they knew or had reason to know that their knowledge of and benefit from

16

Soren's Trade Secrets and Confidential Information was derived from the confidential relationship enjoyed between the former employees and Soren and that the former employees had a duty not to enrich its new employers or principals using Soren Trade Secrets and Confidential Information.

55.    Soren has been damaged as a result of Defendants' use of Soren's Trade Secrets and Confidential Information.

56.    Additionally, Defendants have been unjustly enriched as a result of their misappropriation of Soren's Trade Secrets and Confidential Information.

57.    Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Soren will continue to suffer irreparable harm.

58.    On information and belief, Defendants' continued use of Soren's Trade Secrets and Confidential Information is willful and malicious, and Soren is entitled to recover enhanced damages and its reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

59.    Soren demands judgment against Defendants for all such damage suffered, injunctive relief, actual damages, damages for unjust enrichment, damages for a reasonable royalty as permitted by statute, exemplary damages, attorneys' fees, costs and interest, as well as all other relief provided by 18 U.S.C. § 1836(b).

### COUNT II: Violations of the Computer Fraud and Abuse Act
### (Against McAllister and Keystone)

60.    Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

61.     The actions of Defendants McAllister and Keystone, as set forth herein, constitute computer fraud under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

62.     Soren owns several protected computers and networks that house or that access Soren Trade Secrets and Confidential Information and that Soren and its employees use in or that affect interstate commerce and communication.

63.     Defendants McAllister and Keystone (through agent Miner) intentionally, knowingly, and with intent to defraud Soren, accessed Soren's protected computers without authorization or by exceeding their authorized access and used such access to obtain or alter information in the computer that the Defendants were not entitled so to obtain or alter. This conduct constitutes computer fraud and abuse under federal law.

64.     As a result of these Defendants' conduct, Soren has had to undertake an investigation and forensic study of its computers and networks to discover the wrongdoing. The cost of this investigation, including employee time that otherwise could have been spent on other matters, has equaled or exceeded $5,000. Further, Soren anticipates that the cost of this investigation will continue to rise as they try to discover the scope of Defendants' misconduct and the extent of Soren's losses.

65.     Soren demands judgment against these Defendants for all such damage and loss suffered, injunctive relief, and any other relief that the federal statute provides. Soren expects that further discovery will show that the other Defendants should be added to this cause of action, which Soren will do in due course.

### COUNT III: Violations of the Texas Uniform Trade Secrets Act
### (Against all Defendants)

66.     Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

67.     As detailed above, Soren owns Trade Secrets and Confidential Information that qualify as trade secrets protected under the Texas Uniform Trade Secret Act.

68.     Soren's Trade Secrets and Confidential Information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain secrecy.

69.     Defendants' actions, individually or collectively, have resulted and continued to result in misappropriation of Soren's Trade Secrets and Confidential Information.

70.     Defendants have (i) disclosed or used Soren's Trade Secrets and Confidential Information without Soren's consent; and (ii) at the time of disclosure or use, knew or had reason to know the trade secrets were obtained from someone who had acquired them under circumstances giving rise to a duty to maintain its secrecy or limit is use; or derived from or through a person who owed Soren a duty to maintain its secrecy or limit its use.

71.     The former employees disclosed Soren's Trade Secrets and Confidential Information to Bell and Keystone and all Defendants participated in these unlawful acts for the purposes of using such information for profit and to the detriment of Soren. At the

time of these unauthorized disclosures or uses, the Defendants knew or had reason to know that their conduct was unlawful.

72.     Bell and Keystone acquired Soren's Trade Secrets and Confidential Information from the former employees, and on information and belief, at the time they acquired such information they knew or had reason to know that the former employees obtained the information under circumstances giving rise to a duty owed to Soren to maintain the secrecy or limit use of the Trade Secrets and Confidential Information.

73.     As set forth above, Defendants have willfully and maliciously misappropriated, used, and disclosed Soren's trade secrets in violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. §§ 134A.001 to 134A.008.

74.     Defendants should be held liable to Plaintiffs for all actual damages caused by such violations, as well as for exemplary or punitive damages.

## COUNT IV: Breach of Contract
## (Against the Former Employees)

75.     Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

76.     In 2019 the former employees and Soren entered into Confidentiality and Noncompete Agreements, which are incorporated herein by reference.

77.     These contracts provide that the former employees shall not disclose or misuse Soren's confidential information or use in any way such information for their own benefit; shall not retain any such information after departing Soren; and in all events shall not use any such information to the detriment of Soren (either directly or indirectly).

78.     These contracts further provided that the former employees would not for a period of 24 months after departing Soren solicit Soren's clients or induce any of Soren's clients not to place business with Soren.

79.     Soren provided consideration for all of these promises including providing trade secrets and confidential information that the former employees needed to prosper in their employment relationship (as well as other ongoing benefits).

80.     The former employees breached these contractual duties as described above.

81.     As a result of their breach, Soren sustained financial harm due to the disclosure and use of the Trade Secrets and Confidential Information, including lost business.

82.     Soren demands judgment against Defendants for all such damage suffered, attorneys fees, costs, interest, and all other relief that the law or equity allows.

### COUNT V: Conversion of Confidential Information
### (Against all Defendants)

83.     Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

84.     Soren's Trade Secrets and Confidential Information are the property of Soren, and Soren had the right to possess and use such property. Upon information and belief, to the extent that Soren's Trade Secrets and Confidential Information was disclosed or used, these are wrongful actions and deprive Soren of its intellectual property rights.

85.     Soren thus was injured and will continue to be injured by Defendants' wrongful conversion of its Intellectual Property rights.

### COUNT VI: Tortious Interference with Contract/Prospective Economic Relations
### (Against all Defendants)

86.     Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

87.     Soren has valid and enforceable contractual agreements and prospective economic relations and advantages with its customers and carriers to whom Soren had a reasonable probability of entering into specific freight transportation deals. Such actual and prospective relations and dealings are subject to protection under Texas law.

88.     Moreover, the contractual relationships created and defined under the Confidentiality and Noncompete Agreements between Soren and the former employees are also subject to protection under Texas law.

89.     On information and belief, each of the Defendants, with knowledge of such agreements and economic relations, intentionally and without justification interfered with such relationships between Soren and its customers and carriers seeking that business and prospective business that Soren should have enjoyed would be given to the Defendants. .

90.     On information and belief, Defendants Bell and Keystone, with knowledge of the confidentiality agreements between Soren and the former employees, intentionally and without justification interfered with such contracts when working with or retaining the former employees.

91.     The goodwill and other contractual and economic relationships, including prospective economic advantage, with Soren's customers and carriers, provide substantial economic benefit and advantages to Soren.

92.     Soren's ability to develop and protect such business vendor and customer relationships are critical to the ongoing and future success of Soren.

93.     Without customer and carrier relationships, such as those formed with the customers that were solicited by the former employees, Soren would not be able to expand or sustain its business operations.

94.     Each Defendant named here has interfered with Soren's customer relationships and vendor relationships, and Defendants Bell and Keystone have interfered with the contracts between Soren and the former employees.

95.     The interfering and illegal conduct described herein constitute improper means, as committed by each of the Defendants and such conduct has damaged Soren and continues to damage Soren.

96.     Defendants' willful and intentional interference with such customers and former employees has caused and will continue to cause actual damages to Soren in an amount to be proven at trial.

97.     The conduct by Defendants manifests a knowing and reckless indifference toward and a disregard of the rights of others, including Soren, to a degree to justify and warrant an award of punitive damages in a substantial amount to be proven at trial or otherwise.

**COUNT VII: Conspiracy**
**(Against all Defendants)**

98.     Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

23

99.     Defendants and each of them have engaged in a civil conspiracy, and this conspiracy has damaged and continues to damage Soren.

100.    This conspiracy and illegal plan were formed between each of the Defendants. The object of this civil conspiracy was to use Soren's confidential and proprietary information that the former employees acquired while at Soren, disclose this information to Defendants Bell and Keystone, and then all Defendants to use such to interfere with Soren's goodwill and customer and carrier relationships, so that each of the Defendants named herein could profit from migration of Soren work to the Defendants.

101.    Defendants have been successful in harming and damaging Soren's relationships with the customers and information formerly serviced or known by the former employees when in Soren's employ.

102.    The Defendants reached an understanding or meeting of the minds relative to the illegal plan and conspiracy.

103.    The existence of the illegal plan was established for the immediate targeting of Soren customers using Soren confidential and proprietary information.

104.    The illegal actions that form the basis of this civil conspiracy are the breaches of duties that were owed by the former employees to Soren, and the other tortious and illegal conduct set forth in this Complaint.

105.    Soren has been damaged by the civil conspiracy and illegal plan of the Defendants and such damages have been manifested in Soren's lost business and in the diminishment of its good will.

106.    The willful and intentional conduct of the Defendants named herein has caused and will continue to cause actual damages to Soren in an amount to be proven at trial.

107.    The conduct by Defendants manifests a knowing and reckless indifference toward and a disregard of the rights of others, including Soren, to a degree to justify and warrant an award of punitive damages in a substantial amount to be proven at trial or otherwise.

## COUNT VIII: Attorneys' Fees and Expenses
### (Against all Defendants)

108.    Soren incorporates by reference the foregoing allegations as if fully set forth verbatim herein.

109.    Soren is entitled to recover reasonable and necessary attorneys' fees and expenses for Defendants' actions under the laws that provide for such above, including under Counts I, III, and IV, and including under Chapter 38 of the Texas Civil Practice and Remedies Code. All conditions precedent for this and all other claims have been satisfied.

## IX: REQUEST FOR PRELIMINARY INJUNCTION
### AND EXPEDITED DISCOVERY

110.    Soren notifies the Court that it will be filing a motion for a preliminary injunction and for expedited discovery from all Defendants.

111.    Soren will not be seeking a preliminary injunction that severs the former employees' ability to earn a living for themselves. But it will be seeking a preliminary injunction that these former employees, along with the other Defendants, not use in any

way Soren's Trade Secrets and Confidential Information and that they immediately cease all such wrongful activity immediately.

112.    In order for Soren to know the extent of the damage and irreparable harm that a preliminary injunction and later permanent injunction will address, Soren will need expedited discovery and will accordingly ask for such.

## X: PRAYER

WHEREFORE, Soren prays that Defendants be cited to appear and answer herein, and that the Court upon final hearing or trial hereof, Plaintiffs have judgment against Defendants for all relief prayed for herein, including all actual and exemplary damages, injunctive relief, reasonable and necessary attorneys' fees and expenses, and costs of suit, prejudgment and post-judgment interest, and such other and further relief, general or special, at law or in equity to which Soren may be justly entitled.

Date:  10.26.2020

**Lundwall Law PLLC**

/s/ Steve Lundwall
_____
Steve Lundwall
Texas State Bar No. 12696980
S.D. Texas Admission No. 14180
Email: steve@lundwall-law.com
Tel: 832-209-4220
Main Office:
8969 Meadow Dr.
Sundance, Utah 84604
Texas Office:
710 North Post Oak Road, Suite 400
Houston, Texas 77024

**Attorneys for Plaintiff Soren Transport, Inc.**

26